UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DISTRICT

```
FILED
98 NOV 16 PM 4:20
U.S. DISTRICT COURT
N.D. OF ALABAMA
```

```
-----------------------------------x
                                    :      CV-98-BU-2869-S
                                    :
VINOD PARIKH                        :      CIVIL ACTION NO.
                                    :
Individually                        :
and on behalf of all others         :
similarly situated,                 :      CLASS ACTION COMPLAINT FOR
                                    :      VIOLATIONS OF THE
                      Plaintiff,    :      SECURITIES EXCHANGE ACT
                                    :      OF 1934
     v.                             :
                                    :
                                    :
HEALTHSOUTH CORPORATION, RICHARD M. :
SCRUSHY, LARRY R. HOUSE, MICHAEL D. :
MARTIN, JAMES P. BENNETT, ANTHONY   :
J. TANNER, WILLIAM T. OWENS, ROBERT :      Jury Trial Demanded
E. THOMSON, THOMAS W. CARMAN, P.    :
DARYL BROWN, PHILLIP C. WATKINS, C. :
SAGE GIVENS, RICHARD F. CELESTE and :
PATRICK A. FOSTER,                  :
                                    :
                      Defendants.   :
-----------------------------------x
```

## SUMMARY AND OVERVIEW OF THE ACTION

1.     This is a class action on behalf of all purchasers of the publicly traded securities of HealthSouth Corporation ("HealthSouth" or the "Company") between August 12, 1997 and September 30, 1998 (the "Class Period").  This action arises out of a fraudulent scheme and wrongful course of business that operated as a fraud or deceit on purchasers of HealthSouth securities by HealthSouth and its executive officers and directors ("defendants").

2.   During the Class Period, defendants continually misrepresented the position and prospects of HealthSouth by stating that it was in a "solid financial position" due to its "tremendous franchise" which had positioned HealthSouth to acquire managed care contracts which would continue to drive incremental volume to HealthSouth facilities and thereby enhance HealthSouth's revenue, margin and earnings growth and would enable HealthSouth to continue to produce "consistent financial results."  Moreover, defendants assured investors of HealthSouth's "ability to consistently produce superior financial results which ensured that HealthSouth would achieve earnings per share ("EPS") of $1.15 and $1.40 in 1998 and 1999, respectively.  As late as September 13, 1998, the defendants continued to assure securities analysts during numerous extensive conversations that there had been "no change in" the operating trends at HealthSouth or the "favorable fundamentals affecting HealthSouth."  Defendants, therefore, shared analysts' "conviction" that HealthSouth would achieve $0.30, $0.31 and $1.15 in the third and fourth quarters of 1998 and 1999, respectively.

3.   On the contrary, throughout the Class Period, defendants concealed that HealthSouth's managed care customers sought price reductions from HealthSouth on existing contracts and delayed payments to HealthSouth for services rendered.  As a result, HealthSouth could not possibly grow its revenues at 15%-20% annually or its earnings at 20%-25% annually.  Defendants' scheme, which artificially inflated the price of HealthSouth stock to a Class Period high of approximately $30 was designed to and did

2

enable defendants:  (i) to issue (sell) HealthSouth shares worth approximately $1.6 billion to purchase Horizon Healthcare and National Surgery Center; (ii) issue (sell) $567 million in bonds, convertible into HealthSouth common stock, to raise the $550 million needed to pay for 34 surgery centers acquired from Columbia/HCA; and (iii) in the case of top HealthSouth insiders, to reap $160 million in illegal insider-selling proceeds by unloading 6.0 million of their HealthSouth shares during the Class Period. Defendants' disposed of 83% of their HealthSouth combined stock holdings.

4.  On September 29-30, 1998 -- despite defendants' repeated assurances of HealthSouth's strong operating trends and favorable fundamentals -- defendants suddenly revealed that HealthSouth would likely fall far short of EPS estimates for 1998 and 1999. HealthSouth stock collapsed, falling from a close of $18-3/8 on September 28, 1998 to $10-1/2 on September 30, 1998 -- a 43% two-day decline on huge volume of 32 million shares.  As a result of these acts, plaintiffs and the Class have suffered hundreds of millions of dollars in damage.

5.  HealthSouth and virtually <u>all</u> of its executive officers and directors personally profited from their deliberate and dishonest acts of issuing false and misleading statements to inflate HealthSouth stock by selling HealthSouth stock at artificially inflated prices.  The table below summarizes the sales by the individual defendants:

Individual Defendants

3

| Name/Position | Shares Sold | Sales Price | Aggregate Proceeds | % of Total Shares Owned/Sold |
|---|---|---|---|---|
| Scrushy, CEO | 4,000,000 | $27.00 | $108,000,000 | 87% |
| House, Director | 482,996 | $26.26-30.00 | $13,082,880 | 100% |
| Bennett, President | 199,900 | $26.19-26.72 | $5,287,199 | 71% |
| Martin, CFO | 125,000 | $27.00 | $3,375,000 | 67% |
| Tanner, EVP | 292,750 | $25.94-26.75 | $7,717,481 | 71% |
| Owens, VP | 226,000 | $26.13-27.00 | $5,960,020 | 100% |
| Thomson, Div. Pres. | 128,500 | $26.13-26.63 | $3,387,360 | 98% |
| Carman, VP | 200,000 | $26.00-26.63 | $5,266,520 | 56% |
| Brown, Div. Pres. | 179,810 | $26.25-27.19 | $4,813,689 | 61% |
| Watkins, Director | 160,000 | $26.00-27.15 | $4,299,250 | 53% |
| Celeste, Director | 60,000 | $26.13-27.50 | $1,625,100 | 100% |
| Givens, Director | 30,000 | $27.12 | $813,600 | 100% |
| Foster, Div. Pres. | 11,200 | $26.38-26.50 | $296,188 | 95% |
| TOTALS: | 6,096,156 | $25.94-30.00 | $163,924,287 | 83% |

Defendants' stock sales were dramatic and unusual both in timing and amount.  Richard Scrushy had never sold any significant amount of stock prior to the Class Period.  Nine of HealthSouth's eleven

executive officers sold large portions of their HealthSouth common stock, ranging from 56% to 100% of their holdings. Seven of HealthSouth's eleven directors sold large portions of their HealthSouth common stock, ranging from 53% to 100% of their holdings. A fundamental part of defendants' scheme was to use inflated HealthSouth shares to grow HealthSouth using inflated HealthSouth shares to acquire existing medical operations. For example, HealthSouth acquired National Surgery Centers for approximately $590 million in HealthSouth stock, a transaction that was completed just <u>two months</u> before Health South's stock collapsed in price.

HealthSouth

| Date | Securities Issued | Value | Purpose |
|------|-------------------|-------|---------|
| 10/29/97 | Common Stock | $961 million | Horizon Healthcare acquisition |
| 4/16/98 | Convertible Bonds | $567 million | Columbia Surgery Centers purchase |
| 7/22/98 | Common Stock | $590 million | National Surgery Centers purchase |

### JURISDICTION AND VENUE

6.  Jurisdiction exists pursuant to §27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under §§10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1 and Rule 10(b)-5.

7.  Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts giving rise

5

to the violations complained of occurred in this district. HealthSouth maintains its headquarters in this District.

8.   Defendants used the instrumentalities of interstate commerce, including the U.S. mails, and the facilities of the national securities markets.

### THE PARTIES

9.   Plaintiff Vinod Parikh purchased 600 shares of HealthSouth common stock on August 26, 1998 at $23 1/8 per share and was damaged thereby.

10.   Defendant HealthSouth is a corporation headquartered in Birmingham, Alabama.   HealthSouth is a national provider of inpatient and outpatient rehabilitation, diagnostic services and outpatient surgery, operating in all fifty states.   During the relevant time period, HealthSouth Common stock traded in an efficient market on the New York Stock Exchange under the "HRC" symbol.   HealthSouth has approximately 395 million shares outstanding. Through facilities called Integrated Service Networks ("Integrated Service Networks" or "Integrated Service Models"), HealthSouth offers rehabilitation, diagnostic and surgery services at a single location, in selected markets throughout the Country.

11.   (a) Defendant Richard M. Scrushy ("Scrushy") is Chairman of the Board, Chief Executive Officer and a founder of HealthSouth. Scrushy, by reason of his executive position with HealthSouth and Board membership, was a controlling person of HealthSouth and Board membership, was a controlling person of HealthSouth and had the power and influence, and exercised the same to cause HealthSouth to

6

engage in the conduct complained of herein.  During the Class Period, Scrushy sold 4,000,000 shares of HealthSouth common stock, representing 87% of the HealthSouth stock owned by him for proceeds of $108,000,000.  Prior to the class period, in the Fall of 1996, Scrushy sold only 100,000 of his HealthSouth stock holdings. Before that sale, <u>Scrushy had sold none of his HealthSouth holdings on the open market since 1992</u>.

(b)  Defendant  Larry  R.  House  ("House")  was,  at  all relevant  times,  a  director  of  HealthSouth.   During  the  Class Period,  House  sold  482,996  shares  of  HealthSouth  common  stock, representing  100%  of  the  HealthSouth  stock  owned  by  him  for proceeds of more than $13 million.

(c)  Defendant James P. Bennett ("Bennett") was, at all relevant  times,  the  President,  Chief  Operating  Officer  and  a director  of  HealthSouth.   During  the  Class  Period,  Bennett  sold 199,900  HealthSouth  shares,  representing  71%  of  the  HealthSouth stock owned by him for proceeds of more than $5.2 million.

(d)  Defendant Michael D. Martin ("Martin") was Executive Vice  President  and  Chief  Financial  Officer.   During  the  Class Period, Martin sold 125,000 HealthSouth shares representing 67% of the HealthSouth stock owned by him for proceeds of more than $3.3 million.

(e)  Defendant Anthony J. Tanner ("Tanner") was, at all relevant  times,  the  Executive  Vice  President  and  a  director  of HealthSouth.   During  the  Class  Period,  Tanner  sold  292,750

7

HealthSouth shares representing 71% of the HealthSouth stock owned by him for proceeds of more than $7.7 million.

(f)  Defendant William T. Owens ("Owens") was, at all relevant times, the Group Senior Vice President-Finance and Controller of HealthSouth.  During the Class Period, Owens sold 226,000 HealthSouth shares representing 100% of the HealthSouth stock owned by him for proceeds of more than $5.9 million.

(g)  Defendant Robert E. Thomson ("Thomson") was, at all relevant times, President and Chief Operating Officer of HealthSouth Inpatient Division.  During the Class Period, Thomson sold 128,500 HealthSouth shares representing more than 98% of the HealthSouth stock owned by him for proceeds of more than $3.3 million.

(h)  Defendant Thomas W. Carman ("Carman") was, at all relevant times, the Executive Vice President, Corporate Development, of HealthSouth.  During the Class Period, Carman sold 200,000 HealthSouth shares representing 56% of the HealthSouth stock owned by him for proceeds of more than $5.2 million.

(j)  Defendant Phillip C. Watkins ("Watkins") was, at all relevant times, a director of HealthSouth.  During the Class Period, Watkins sold 160,000 HealthSouth shares representing more than 53% of the HealthSouth stock owned by him for proceeds of more than $4.2 million.

(k)  Defendant Richard F. Celeste ("Celeste") was, at all relevant times, a director of HealthSouth.  During the Class Period, Celeste sold 60,000 HealthSouth shares representing 100% of

8

the HealthSouth stock owned by him for proceeds of more than $1.6 million.

(l) Defendant C. Sage Givens ("Givens") was, at all relevant times, a director of HealthSouth. During the Class Period, Givens sold 30,000 HealthSouth shares representing 100% of the HealthSouth stock owned by him for proceeds of $813,600.

(m) Defendant Patrick A. Foster ("Foster") was, at all relevant times, President and Chief Operating Officer of HealthSouth Surgery Division. During the Class Period, Foster sold 11,200 HealthSouth shares representing 95% of the HealthSouth stock owned by him for proceeds of $292,188.

12. The defendants identified in ¶11(a)-(m) above are referred to herein as the "Individual Defendants." Because of the positions these Individual Defendants maintained at HealthSouth, they each knew the adverse, non-public information about the business of HealthSouth, as well as its finances and future business and EPS prospects. Each had access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), participation in conversations with other corporate officers and employees, attended management and/or Board of Directors' meetings and committees thereof, and received reports and other information provided to them in connection therewith.

13. As officers, directors and/or controlling persons of a publicly held company and as sellers of HealthSouth stock, each of the Individual Defendants had a duty to disseminate accurate and

9

truthful information promptly with regard to HealthSouth and to correct any previously issued statements that had become untrue and to disclose any adverse trends known to them that would materially affect the operating results of HealthSouth, so that the market price of HealthSouth stock would be based upon truthful and accurate information.   Notwithstanding their duty to refrain from selling HealthSouth stock while in the possession of material adverse non-public information concerning HealthSouth, each of the defendants benefitted substantially from their fraud, including:

> ● The Individual Defendants who sold or otherwise disposed of 6.0 million shares of the Company's stock, pocketed over $163 million.

> ● HealthSouth which issued (sold) over $1.6 billion worth of HealthSouth common stock to complete two acquisitions, and sold $567 million worth of bonds convertible into HealthSouth common stock to raise the cash to complete another acquisition.

14.   The Individual Defendants controlled the contents of HealthSouth's SEC filings, corporate reports, communications to analysts and press releases.   Each of the Individual Defendants participated in writing or reviewing HealthSouth's corporate reports, press releases and SEC filings alleged to be misleading and thus had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.   Thus, each of the Individual Defendants is legally

10

responsible for falsifying HealthSouth's public reports, financial statements and releases, detailed herein as "group-published" information.

### DEFENDANTS' FRAUDULENT SCHEME
### AND COURSE OF BUSINESS

15.  Each of the defendants is liable for making false and misleading statements, failing to disclose material adverse facts, and participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of HealthSouth stock.  Defendants misdeeds were designed to and did: (i) deceive the investing public regarding HealthSouth; (ii) artificially inflate the price of HealthSouth securities; (iii) cause Class members to purchase HealthSouth securities at inflated prices; (iv) permit certain of the Individual Defendants to sell 6.0 million shares of their own HealthSouth stock at inflated prices, pocketing $163 million; (v) permit HealthSouth to issue (sell) $1.6 billion worth of HealthSouth common stock to complete the acquisitions of Horizon Healthcare and National Surgery Centers; and (vi) permit HealthSouth to issue (sell) $567 million worth of bonds, convertible into HealthSouth's common stock, to finance the $550 million acquisition of 34 surgery centers from Columbia/HCA.

### HEALTHSOUTH'S AND ITS INSIDERS' ACTUAL KNOWLEDGE
### OR RECKLESS DISREGARD OF THE UNDISCLOSED ADVERSE
### CONDITIONS IMPACTING HEALTHSOUTH'S BUSINESS

16.  In order to monitor HealthSouth's overall corporate performance throughout the year, HealthSouth's top executives received monthly financial reports prepared by HealthSouth's financial department, under the guidance of Martin, HealthSouth's

Chief Financial Officer, as well as other written and oral reports
from members of management, including divisional managers and
regional directors.  To effectively manage its business and control
its cash flow, HealthSouth's management information system was
capable of generating reports on a daily basis showing sales
revenue by territory and by facility or "store," as well as overall
corporate revenue, expenses, cash balances, etc.  As a result of
this system, the Individual Defendants, who were HealthSouth's top
managers, were aware of the corporation's performance on a daily
basis and were thus aware, virtually immediately, of any
significant problems with sales, revenue or expenses of any
particular facility, "store" or territory.  Every Monday morning a
meeting was held of the top executive officers of HealthSouth at
its corporate headquarters in Birmingham, moderated by defendants
Scrushy and/or Martin.    During each of these Monday morning
meetings, the HealthSouth executives would individually review the
events of the previous week, and the plans for the upcoming week,
officer by officer.

    17.   In addition to this intricate and extensive monitoring
system of HealthSouth locations, HealthSouth's finance department
generated monthly financial reports providing detailed data with
respect to overall corporate revenue, net income and EPS, as well
as sales by facility and by territory -- all presented so as to
compare performance for that month, that quarter and the year-to-
date compared to the Company's plan/budget.    These monthly
financial reports included a report prepared immediately after the

12

monthly cost and distributed to top management within 48-72 hours, which provided summary sales, expense and income data. These reports also included a monthly financial statement package that provided even more detailed information, including graphic comparisons of actual performance to forecasted performance and a narrative explanation of material variances of actual results compared to forecasted or budgeted results, which was completed within ten day after the monthly close and immediately provided to members of top management at the regularly scheduled Monday morning meeting.

18. When HealthSouth's managed care customers began delaying payments to HealthSouth for services rendered and began to negotiate for substantial reductions in price in existing contracts, HealthSouth's internal corporate procedures immediately advised top executives of these problems. Because the sales volume HealthSouth achieved from its managed care customers was absolutely critical to HealthSouth achieving the 20%-25% EPS growth and 15%-20% revenue growth forecasted for 1998-1999, the problems related to HealthSouth's managed care customers and their potential impact on the price of HealthSouth common stock were a matter of major concern and discussion among HealthSouth's top corporate managers, including the Individual Defendants. This information at HealthSouth in financial reports and/or the financial statement reporting packages distributed to them throughout the Class Period and discussed during the regular Monday morning meetings.

13

19. Because of the foregoing, each of the Individual Defendants was aware of HealthSouth's 1998-1999 forecasts and budgets, and of the internal reports detailing the distribution problems and the financial reports comparing HealthSouth's actual results to those budgeted and/or forecasted. Based on the negative internal reports specified earlier and reports of the Company's actual performance compared to the budgeted and forecasted, the Individual Defendants each knew HealthSouth's business was not performing as well as publicly represented. Thus, defendants actually knew that each of the forward-looking public statements issued during the Class Period about HealthSouth were false and misleading when made and actually knew or recklessly disregarded that the non-forward-looking statements issued during the Class Period about HealthSouth were false and misleading when made.

## BACKGROUND TO THE CLASS PERIOD

20. On February 18, 1997, HealthSouth announced that it had agreed to buy Horizon/CMS Healthcare Corporation ("Horizon") for $961 million in stock and the assumption of $700 million of debt. Defendant Scrushy stated:

> "Whoever bought this particular company would end up with the largest rehabilitative share in America. We've got a tremendous franchise. . . . If we were to go out and try to build this network that we're acquiring, it'd take a lifetime. . . . Once we own these hospitals and these outpatient centers, that pretty much shuts out any other health care company from ever getting into our business in a significant way."

Because of regulatory delays in obtaining the approval of this acquisition, however, defendants were unable to close the Horizon deal until October 29, 1997.

14

Between February 1997 and August 1997, the price of HealthSouth stock fluctuated by over one third of its value, closing as high as 28 3/4 and as low as 18 3/8. By August 1997, HealthSouth stock had begun again to decline in price. Defendants realized that HealthSouth, after achieving several consecutive quarters of a sequential growth in revenues and EPS, was about to hit a wall. Managed care customers had begun to demand price concessions from HealthSouth and had begun to delay making payments to HealthSouth for services rendered. This information, if revealed to the securities markets, would have caused the price of HealthSouth common stock to decline substantially, potentially jeopardizing HealthSouth's acquisition of Horizon, the bulk of which was financed with $961 million worth of HealthSouth stock. Defendants viewed the Horizon acquisition as one of the most important acquisitions in the history of HealthSouth as it would enable HealthSouth to continue to keep pace with its historical rate of 15%-20% growth in revenues and 20-25% growth in EPS and would allow HealthSouth to hide some of its operating deficiencies via the use of acquisition-related write-offs.

21. Defendants realized that any decline in HealthSouth's common stock price would substantially harm them as a large percentage of each of the Individual Defendants' wealth was in the form of HealthSouth common stock. Further, defendants realized that any decline in the price of HealthSouth common stock would greatly reduce the defendants' ability to continue to use HealthSouth stock as a currency to acquire other businesses.

15

HealthSouth's inability to continue to grow through acquisition would have disabled it from maintaining its historical 15%-20% annual growth rate in revenue and 20-25% annual growth rate in EPS. In an effort, therefore, to stave off any decline in the share price of HealthSouth, which was critical to the completion of the acquisition of Horizon which was to be financed largely with HealthSouth stock, the defendants began, on August 12, 1997, a scheme to artificially maintain and inflate the share price of HealthSouth common stock.

## FALSE AND MISLEADING STATEMENTS

22. On August 12, 1997, defendant Scrushy had private one-on-one conversations with securities analysts, including Helen O'Donnell ("O'Donnell") of PaineWebber and Lucy Olwell ("Olwell") of Credit Swisse First Boston. Several of these conversations occurred at HealthSouth's headquarters in Birmingham, Alabama. During these conversations, Scrushy told O'Donnell and Olwell that:

- There was no fundamental reason for the recent decline in the price of HealthSouth's common stock and HealthSouth's fundamental growth prospects remained intact.

- Same-store sales increases and improvements to recently acquired businesses should easily drive 25% annual earnings growth and provide for upside earnings surprises.

- HealthSouth could continue to grow its revenues by 15-20% from its current asset base.

- The closure of the Horizon acquisition was imminent and extremely important to HealthSouth, for once it was in place, HealthSouth would have its essential business platform for growth in place, achieve significant same-store cost reductions and meaningfully accelerate internal development between 1998-2000.

16

  • As a result, HealthSouth could easily achieve 1997
  and 1998 EPS of $0.93-0.94 and $1.15, respectively.

23.  On September 3, 1997, HealthSouth announced that it had
agreed to acquire ASC Network Corp. for $180 million in cash and
assumed debt.  ASC Network operated 29 surgery centers throughout
the country.  In connection with this announcement, defendant
Scrushy spoke to securities analysts, including Jean Swenson
("Swenson") at Alex. Brown, Maureen Sullivan ("Sullivan") at Cowen
& Co. and Olwell.  During those conversations, Scrushy stated:

  • The acquisitions of ASC Network had expanded
  HealthSouth's Integrated Service Model which was key to
  HealthSouth's ability to continue to report growth in
  annual EPS of 25%.

  • The acquisition of Horizon would close in mid-
  October 1997.

  • HealthSouth remained on track and, given its same-
  store sales growth and operating leverage, HealthSouth
  would continue to post annual EPS growth of 20%-25% and
  1997 and 1998 EPS of $0.93 and $1.13-1.15, respectively.

24.  On October 29, 1997, HealthSouth completed the
acquisition of Horizon for approximately $960 million in stock and
the assumption of approximately $700 million in debt.

25.  On October 30, 1997, HealthSouth reported that, for the
third quarter of 1997, its earnings rose to $0.24 per share from
$0.19 per share in the third quarter of 1996.  Defendant Scrushy
stated:

  In the third quarter, we achieved record
  profitability, continued to execute our internal growth
  strategy, and closed the ASC Network acquisition. . . .
  Continued same-store growth, increased internal
  development, and expense controls drove our increased
  profitability.  In addition to opening or acquiring 69
  locations within the quarter, including 53 outpatient
  rehabilitation locations, three outpatient surgery

17

centers, and 13 occupational medicine facilities, we also closed the ASC Network acquisition on September 30, adding 29 outpatient surgery center and creating six new Integrated Service Markets.

We are also pleased to announce the closing of the Horizon/CMS acquisition on October 29, which adds over 300 new inpatient and outpatient rehabilitation locations which we believe present excellent opportunities for growth.   We look forward to the integration of the Horizon/CMS facilities into our national network, which will allow us to even better serve our patients and payors.

26.   In connection with this announcement, HealthSouth held a conference call with large institutional investors and securities analysts including Joseph Chiarelli ("Chiarelli") of J.P. Morgan Securities, O'Donnell and Swenson.   During that call and in private one-on-one conversations with Chiarelli, O'Donnell and Swenson thereafter, Scrushy stated:

● He was very positive about HealthSouth's performance, which was strong across the board.

● HealthSouth had over 1500 projects in its acquisition pipeline with approximately $3.5 billion in revenues.

● Sales volume remained strong.

● Pricing remained stable.

● HealthSouth continued to build its managed care business, signing up 300 new contracts during the quarter, which was a positive development.

● As result, HealthSouth would meet 1997 and 1998 EPS estimates of $0.93-0.94 and $1.15, respectively.

27.   On November 3, 1997, HealthSouth announced that it had sold certain non-strategic assets of Horizon for $1.25 billion in cash.   In connection with that announcement, as reflected in the November 4, 1997 San Antonio Express-News, Scrushy stated:

"We're sitting here loaded with a billion in cash . . . it's all opportunity . . . ."

28.   On November 6, 1997, defendant Scrushy sold 4 million HealthSouth shares, 99% of his holdings, for $27 per share, or $108 million.   To allay concern about his planned bailout, Scrushy indicated that he wanted to exercise expiring options before knowledge of another pending transaction blocked him from trading. Commenting on the huge sale, Scrushy stated:  "It's what any normal red-blooded American would do."

29.   Between November 6 and November 28, 1997, the Individual defendants embarked upon a torrential selling spree dumping over 5.1 million shares for proceeds of more than $137 million dollars.

30.   The statements in ¶¶22-28 were false and misleading when made.   The true facts, which defendants concealed, were that:

(a)   HealthSouth's managed care customers had begun to indicate that they would seek significant price reductions in 1998;

(b)   HealthSouth's managed care customers had begun, in any effort to mitigate the escalation of healthcare costs, to delay payments to HealthSouth for services it had rendered;

(c)   HealthSouth's profit margins were not rising but were beginning to soften;

(d)   As a result of (a)-(c), defendants knew or recklessly disregarded that HealthSouth could not grow its earnings by 25% annually in 1997 and 1998.

31.   On or about January 8, 1998, Phycor announced that it would not proceed with its agreement to acquire Medpartners.   Upon this announcement, the price of Medpartners common stock collapsed

approximately 40%, causing stocks throughout the industry, including HealthSouth's , to soften.

32.   On January 16, 1998, Medpartners issued a press release regarding the termination of Phycor's agreement to acquire Medpartners, and the appointment of defendant Scrushy as Chairman and Acting Chief Executive Officer of Medpartners.   In connection with that press release, Scrushy stated:

> "First and foremost, I will be continuing in all my current roles and responsibilities with HealthSouth.  <u>I could only undertake this assignment knowing that HealthSouth has deep pool of talented executives, is in solid financial position, is producing consistent financial results, and is successfully executing its strategic plan</u>."

33.   On February 16, 1998, analyst Sullivan of Cowen & Co. met with defendants Scrushy, Martin, Bennett and Thomson at the HealthSouth headquarters in Birmingham, Alabama.   During that meeting defendants Scrushy, Martin, Bennett and/or Thomson stated:

- HealthSouth only had Integrated Service Networks in 96 of the 300 largest metropolitan areas and thus HealthSouth still had plenty of growth ahead.

- HealthSouth still had numerous acquisition opportunities.

- The budget process for 1998 had recently been completed and they each felt very comfortable with HealthSouth's budget, which called for 1998 EPS growth of 25%, which HealthSouth would meet or exceed.

- HealthSouth would meet or exceed 1999 EPS growth expectations of 20%-25%.

- As a result, HealthSouth would meet 1997, 1998 and 1999 EPS estimates of $0.93-$0.94, $1.14 and $1.40, respectively.

34.   On February 25, 1998, HealthSouth announced that, for 1997, its earnings rose to $0.94 from $0.74 in the previous year. Defendant Scrushy stated:

> "HEALTHSOUTH's 46th quarter of meeting or exceeding analysts' expectations demonstrates our ability to consistently produce superior financial results . . . . In 1997, we added over 275 new locations through internal development, completed the Health Images acquisition in March, closed the ASC Network acquisition in September, and completed the Horizon/CMS acquisition in October.   On December 31, 1997, HEALTHSOUTH completed the divestiture of the Horizon/CMS long-term care assets for $1.25 billion.  This significantly strengthened our balance sheet, leading to our recent upgrade by both Standard & Poor's and moody's to investment grade.  <u>We plan to continue executing our strategic plan in 1998 by growing our existing product lines, backed by our added financial strength and ability to deliver consistent financial results</u>.

35.   In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, with institutional investors and securities analysts, including Chiarelli.   During that call and in follow-up one-on-one conversations, defendant Scrushy stated:

- He was very positive about HealthSouth's financial performance and position.

- HealthSouth's business was strong across all business lines and experiencing substantial growth.

- Managed care contracts were driving the same-store sales growth.

- HealthSouth's acquisition pipeline remained full.

- HealthSouth continued implementation of its Integrated Service Model.

- HealthSouth had a significant competitive pricing advantage in that its Medicare costs were 40% of the industry average ($10,230 cost per discharge vs $19,250).

- HealthSouth continued to execute its strategic plan.

- As a result, Scrushy remained comfortable that HealthSouth would meet 1998 and 1999 EPS estimates of $1.15 and $1.40, respectively.

36. On or about March 20, 1998, HealthSouth commenced an offering (the "Offering") of $567,750,000 3.25% convertible subordinated debentures, which were convertible into HealthSouth common stock at a price of $36.25. These securities were priced, in large part, based upon the performance of HealthSouth's common stock and the financial position of HealthSouth.

37. In connection with the Offering, HealthSouth issued a Registration Statement and Prospectus which stated:

REIMBURSEMENT BY THIRD-PARTY PAYORS

Substantially all of HEALTHSOUTH's revenues are derived from private and governmental third-party payors (in 1997, approximately 36.9% from Medicare and approximately 35.1% from commercial insurers, managed care plans, workers' compensation payors and other private pay revenue sources). There are increasing pressures from many payor sources to control healthcare costs and to limit increases in reimbursement rates for medical services. There can be no assurances that payments under governmental and third-party payor programs will remain at levels comparable to present levels. In attempts to limit the federal budget deficit, there have been, and HEALTHSOUTH expects that there will continue to be, a number of proposals to limit Medicare reimbursements for certain services. HEALTHSOUTH cannot now predict whether any of these pending proposals will be adopted or, if adopted and implemented, what effect such proposals would have on HEALTHSOUTH.

38. The foregoing was false or misleading because defendants knew that private third-party payors had begun to demand price concessions on existing contracts. As a result, HealthSouth could not sustain EPS growth of 25% and defendants knew this.

39. On March 16, 1998, the "Heard on the Street" column of The Wall Street Journal contained an article regarding HealthSouth, specifically dealing with defendant Scrushy's service as the temporary CEO of Medpartners. When asked whether he was spending to much time serving as the CEO of Medpartners, Scrushy stated: "The answer to that is 'no,' and if you just wait around a couple of weeks, you'll see why."

40. On April 16, 1998, HealthSouth announced that it had acquired 34 outpatient surgery centers from Columbia/HCA Healthcare Corp. for $550 million. Defendant Scrushy stated:

> They're outstanding centers and they're in great locations . . . . In really prevents anyone else from being able to build the position that we have in this business.

41. In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, with institutional investors and securities analysts, including Sullivan, Swenson and Chiarelli. During that call or in follow-up, one-on-one conversations thereafter, Scrushy stated:

> ● HealthSouth's management team would improve the operating results of the assets it acquired from Horizon.
>
> ● HealthSouth still had plenty of room to grow as Integrated Service Networks were only in 96 of the top 300 markets.

- Revenues in Integrated Service Networks had the potential to improve 20%-25% with cross-referrals from other HealthSouth facilities.

- Margins in Integrated Service Networks were typically 3%-5% higher than conventional stand-alone facilities.

- As a result, HealthSouth's EPS would continue to grow at 20%-25% annually for the next three years and achieve analysts' EPS estimates of $1.15 in 1998 and $1.40 in 1999.

42. On April 21, 1998, HealthSouth announced that, for the first quarter of 1998, its earnings rose to $0.27 per share from $0.22 per share in the first quarter of 1997. Defendant Scrushy stated: "[W]e just blew it out with development." He further stated:

"I am pleased to report our 47th consecutive quarter of meeting or exceeding analysts' expectations . . . . During the first quarter of 1998, we continued the successful integration of our major 1997 acquisitions and the implementation of our Integrated Service Model. In addition, we added 106 new facilities through our internal development program and continued to recognize strong same-store growth in all divisions. During the quarter, we also received investment-grade ratings from Standard & Poor's and Moody's and capitalized on the upgrade to raise nearly $568 million in an institutional private placement of convertible debentures. As we move into the second quarter, we have continued to further our strategic plan with last week's announcement of HEALTHSOUTH's pending acquisition of 34 ambulatory surgery centers from Columbia/HCA."

43. In connection with the foregoing announcement, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional investors and securities analysts, including Swenson, Chiarelli and Sullivan. During that call and in follow-up one-on-one conversations thereafter, Scrushy stated:

- He was very positive about HealthSouth's performance and prospects, and HealthSouth's business was strong across all business lines.

24

● Managed care contracts were continuing to drive incremental volume to HealthSouth's facilities and were boosting revenue, margins and earnings growth.

● The continued implementation of the Integrated Services Model would increase margins and position HealthSouth for managed care.

● As a result, HealthSouth could continue to grow its earnings at an annual rate of 20%-25%, and thereby meet estimates of $1.15-$1.16 in 1998 and $1.40 in 1999.

44. The statements in ¶¶37-43 were false and misleading when made. The true facts, which defendants concealed, were that:

a. HealthSouth's managed care customers had begun to indicate that they would seek significant price reductions in 1998;

b. HealthSouth's managed care customers had begun, in an effort to exacerbate the escalation of healthcare costs, to delay payments to HealthSouth for services it had rendered;

c. As a result, HealthSouth's profit margins would not rise but would fall;

d. While the Registration Statement and Prospectus revealed that there were "increasing pressures" from "many payor sources" to "control healthcare costs" and to "limit increases in reimbursement rates," the defendants concealed that several payor sources had then informed HealthSouth that it would demand reductions in reimbursement rates in 1998 and 1999;

e. The defendants concealed that several of HealthSouth's managed care customers were delaying payments to HealthSouth;

f. As a result of a-e, HealthSouth's financial position had been materially weakened:

25

g.   As a result of a-f, Healthsouth was not in a "solid financial position," and could not "successfully execut[e] its strategic plan"; and

h.   As a result of a-g, the defendants knew or recklessly disregarded that HealthSouth could not grow its earnings by 25% annually.

45.   On May 6, 1998, HealthSouth announced that it had signed an agreement to acquire National Surgery Centers, Inc. for $590 million in HealthSouth stock.   Under the terms of the deal, HealthSouth would pay no less than 0.8714 shares of HealthSouth stock valued at $30.50 and no more than 1.159 shares of HealthSouth stock for each share of National Surgery Centers.   Defendant Scrushy stated:

> The addition of NSC's surgery centers further solidified HEALTHSOUTH's position as the nation's leading provider of outpatient surgery services.   The 250 surgery centers that we will operate upon consummation of the NSC transaction and the recently announced acquisition of 34 surgery centers from Columbia/HCA will enable us to provide high-quality, cost-effective outpatient surgery services to physicians, patients and payors in more locations than any other company has ever done.   We expect the transaction to be immediately accretive to earnings, and we look forward to working with these outstanding facilities as we integrate them into HealthSouth's national network.

46.   In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional investors and securities analysts, including Sullivan, Swenson, O'Donnell, A.J. Rice ("Rice") of Bear Stearns and Chiarelli.

26

During that call or in follow-up one-on-one conversations, defendant Scrushy stated:

- Healthsouth's business remained strong.

- The acquisition of National Surgery Centers increased the likelihood that HealthSouth would continue to achieve 20%-25% annual EPS growth.

- HealthSouth continued to implement its Integrated Service Model, which was designed to produce higher margins.

- As a result, he remained confident that HealthSouth would achieve EPS estimates of $1.15-$1.16 in 1998 and $1.40 in 1999.

47.  On July 21, 1998, HealthSouth announced that, for the second quarter of 1998, its EPS rose to $0.28 from $0.23 in the second quarter of 1997.  In connection with this announcement, defendant Scrushy stated:

> I am very pleased to report our operating results for the second quarter of 1998 . . . . During the quarter we continued our focus on internal growth as well as agreeing to acquire National Surgery Centers, Inc. and over 30 outpatient surgery centers from Columbia/HCA Healthcare Corporation.  Our financial performance remained strong as we benefited from the profitability associated with strong same-store growth, as well as from economies of scale and expense controls.
>
> We were pleased to close the Columbia/HCA acquisition on July 1, 1998.  With an 85% overlap with HEALTHSOUTH markets, we expect that this acquisition will be immediately accretive to earnings and contribute to our integrated service model development.  I am also pleased to announce the expected closing of the National Surgery Centers acquisition later this week.

48.  In connection with this press release, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional

investors and securities analysts.  During that call and in private one-on-one conversations with Swenson, Sullivan and Chiarelli thereafter, Scrushy stated;:

- He was very positive regarding Healthsouth's performance and position.

- During the quarter, HealthSouth added 577,000 new lives to its Integrated Services Division, a positive development.

- The Integrated Services Division, coupled with managed care contracts, was continuing to drive incremental volume to HealthSouth facilities and thereby enhancing revenue, margin and earnings growth.

- As a result, HealthSouth's same-store sales growth remained strong.

- Healthsouth had an acquisition pipeline of approximately 1,500 candidates, with approximately $3.5 to $4 billion in revenues.

- As a result, HealthSouth would be able to grow its revenues at the rate of 15%-20% through the year 2001.

- As a result, HealthSouth would be able to grow its earnings at 20%-25% in 1998 and 1999 and thereby meet EPS estimates of $1.15 in 1998 and $1.40 in 1999.

49.  During the week of July 20, 1998, Healthsouth completed the acquisition of National Surgery Centers by issuing 1.0972 shares of HealthSouth stock for each share of National Surgery Centers stock, or stock worth approximately $590 million.

50.  between July 20, 1998 and July 27, 1998, HealthSouth's shares fell by approximately 15.5%.  <u>As a result, analyst Chiarelli of J.P. Morgan Securities called HealthSouth on or about July 27, 1998 and spoke extensively with its management, including defendants Scrushy and/or Martin</u>/  During those extensive conversations, defendants Scrushy and/or Martin stated:

- The decline in HealthSouth's shares had no basis in fact and was not due to any fundamental reason.

- <u>They had the conviction that HealthSouth would achieve EPS of $0.30, $0.31 and $1.15 in the third and fourth quarters of 1998 and 1999, respectively</u>.

- The Company continued to experience solid increases in same-store sales growth in all of its divisions.

- The Company expected strong internally generated growth through 1999 and, as a result, it would have no difficulty in achieving EPS of $1.40 (or 21% growth over 1998).

51. Between July 27 and August 14, 1998, the price of HealthSouth remained weak. As a result, analyst Sullivan of Cowen & Co. contacted HealthSouth and spoke with its management, including defendant Scrushy and/or Martin. During those conversations, which occurred on August 13, 1998, Scrushy and/or Martin stated:

- HealthSouth was not being adversely impacted by HMOs' efforts to obtain price reductions.

- HealthSouth had already negotiated discounted fees in exchange for volume contracts and Healthsouth, given its cost advantage, would not be adversely impacted.

- There was <u>no change in operating trends</u> at HealthSouth.

52. Between August 4 and August 14, 1998, analyst Rice of Bear Stearns also had several conversations with HealthSouth management, including defendants Scrushy and;/or Martin, regarding the weakness in HealthSouth's share price. During those conversations, defendants Scrushy and/or Martin stated:

- <u>There had been no change in the favorable fundamentals enjoyed by Healthsouth</u>.

29

  • <u>The operating trends at HealthSouth had changed little</u> from the 23% increase in EPS HealthSouth achieved in the second quarter of 1998.

53. Between July 27, 1998 through and including September 13, 1998, analyst Chiarelli of J.P. Morgan Securities spoke extensively with Healthsouth's management, including defendants Scrushy and/or Martin, in private one-on-one conversations. During those conversations, defendants Scrushy and/or Martin stated:

  • The decline in HealthSouth's shares had no basis in fact and was not due to any fundamental reason.

  • <u>They had the conviction that HealthSouth would achieve $0.30, $0.31 and $1.15 EPS in the third and fourth quarters of 1998 and 1999, respectively</u>.

  • The Company continued to experience solid increases in same-store sales growth in all of its divisions.

  • The Company expected strong internally generated growth through 1999 and, as a result, it would have no difficulty in achieving EPS of $1.40 (or 21% growth over 1998).

54. On September 14, 1998, analyst Rice of Bear Stearns spoke with management at HealthSouth, including defendants Scrushy and/or Martin, regarding the Bear Stearns Healthcare Conference to be held the week of September 21, 1998, at which defendant Scrushy was scheduled to speak on September 25, 1998. During those private one-on-one conversations, defendants Scrushy and/or Martin told Rice that:

  • Scrushy hoped to have some "positive things" regarding HealthSouth to discuss at the conference.

  • HealthSouth's management was frustrated with the recent sell-off in HealthSouth's share price, and Scrushy would address the concerns of investors at the conference.

30

55. On Friday, September 25, 1998, defendant Scrushy spoke at the Bear Stearns Healthcare Conference. During the conference, which was attended by numerous securities analysts, including Rice of Bear Stearns, Scrushy stated:

> • He was positive and upbeat regarding Healthsouth's prospects.
>
> • He was confident in the Company's ability to achieve analysts earnings expectations of $0.30, $0.31 and $1.15 for the third and fourth quarters of 1998 and 1999, respectively.

56. The statements in ¶¶45-55 were false and misleading when made. The true facts, which defendants concealed, were that:

a. HealthSouth's managed care customers had begun to indicate that they would seek significant price reductions in 1998;

b. HealthSouth's managed care customers had begun, in an effort to exacerbate the escalation of healthcare costs, to delay payments to HealthSouth for services it had rendered;

c. As a result, HealthSouth's profit margins were not rising but falling;

d. While the Registration Statement and Prospectus revealed that there were "increasing pressures" from "many payor sources" to "control healthcare costs" and to "limit increases in reimbursement rates," the defendants concealed that several payor sources had then informed HealthSouth that it would demand reductions in reimbursement rates in 1998 and 1999;

e. The defendants concealed that several of HealthSouth's managed care customers were delaying payments to HealthSouth;

31

f.   As a result of a-e, HealthSouth's financial position had been materially weakened:

g.   As a result of a-f, Healthsouth was not in a "solid financial position," and could not "successfully executing its strategic plan"; and

h.   As a result of a-g, the defendants knew or recklessly disregarded that HealthSouth could not grow its earnings by 25% annually in 1998 and would not achieve EPS of $0.30, $0.31 and $1.15 and $1.40 in the third and fourth quarters of 1998 and 1999, respectively.

57.  On September 29, 1998, HealthSouth's stock price began to collapse, falling from $18-3/8 to $14-5/8, as HealthSouth began to communicate to analysts that it might miss analysts' EPS estimates for the third and fourth quarters of 1998 and 1999.  Then, on September 30, 1998, HealthSouth revealed, in stark contrast to the numerous positive statements defendant Scrushy and HealthSouth management made during the Class Period, that:

a.   It was <u>continuing</u> to see pressure from major managed care firms to renegotiate existing contract terms;

b.   It <u>"was being pressured by payors to renegotiate rates and [was] seeing delays in payment under current contracts</u>;"

c.   As a result, HealthSouth could no longer grow its earnings at the historical 20%-25% rate but only a 15%-20% rate going forward; and

d.   As a result, HealthSouth might miss "analysts" earnings estimates in 1998 and 1999.

32

58.   Defendant Scrushy stated:  "If we determine that market estimates are out of line with our internal expectations, we will reverse our guidance to the investment community.  Until we have completed that process, we believe it is premature to comment on our expectations for the coming months."  Scrushy did, however, admit:  "[W]e think there will be some adjustment."  However, upon this announcement, several analysts revised their 1998 and 1999 EPS estimates downward.  Over the two-day period from September 29-30, 1998, HealthSouth stock collapsed approximately 50% in value from $18-3/8 to $10-1/2 and the price of Healthsouth's 3.25% convertible subordinated debentures declined to approximately 20% below the price at which they were offered.  As a result, plaintiffs and the Class  suffered  hundreds  of  millions  of  dollars  in  damage.  Defendants,  as  reflected  in  the  following  paragraph,  fared  far better.

## HEALTHSOUTH'S AND ITS INSIDERS' STOCK SALES

While  HealthSouth's  insiders  were  issuing  false  and misleading statements about HealthSouth's business, HealthSouth was able to sell bonds to the public to raise $567 million to acquire 34 surgery centers from Columbia/HBA and issue HealthSouth shares worth  $1.6  billion  to  purchase  horizon  and  National  Surgery Centers.  This artificial inflation in HealthSouth's stock price also enabled the Individual Defendants to sell over 6.0 million shares of their HealthSouth stock for proceeds of approximately $163  million  to  profit  from  the  artificial  inflation  in HealthSouth's  stock  price  their  fraud  had  created,  in  some

instances selling large portions of the shares they owned or had acquired via the exercise of options during the Class Period. Notwithstanding their access to non-public information as a result of their positions with the Company, the Individual Defendants identified below sold the following amounts of HealthSouth shares at artificially inflated prices through the Class period while in possession of material non-public information:

| Name/Position | Shares Sold | Sales Price | Aggregate Proceed | % of Total Shares Owned/Sold |
|---|---|---|---|---|
| House, Director | 482,996 | $26.26 - 30.00 | $ 13,082,880 | 100% |
| Bennett, Pres. | 199,900 | $26.19 - 26.72 | $ 5,287,199 | 71% |
| Martin, CFO | 125,000 | $27.00 | $ 3,375,000 | 67% |
| Tanner, EVP | 272,750 | $25.94 - 26.75 | $ 7,717,481 | 71% |
| Owens, VP | 226,000 | $26.13 - 27.00 | $ 5,960,020 | 100% |
| Thomson, Div. President | 128,500 | $26.13 - 26.63 | $ 3,387,360 | 98% |
| Carman, VP | 200,000 | $26.00 - 26.63 | $ 5,266,520 | 56% |
| Brown, Div. President | 179,810 | $26.25 - 27.19 | $ 4,813,689 | 61% |
| Watkins, Dir. | 160,000 | $26.00 - 27.15 | $ 4,299,250 | 53% |
| Celeste, Dir. | 60,000 | $26.13 - 27.50 | $ 1,625,100 | 100% |
| Givens, Dir. | 30,000 | $27.12 | $ 813,600 | 100% |
| Foster, Div. President | 11,200 | $26.38 - 26.50 | $ 296,188 | 95% |
| | | | | |
| TOTALS: | 6,096,156 | $25.94 - 30.00 | $163,924,287 | 83% |

59.    These insider stock sales were unusual in timing and amount. The Individual Defendants all sold large portions of their holdings. As the foregoing tables illustrate, the defendants sold or issued Healthsouth stock and securities when the securities were artificially inflated due to the nondisclosure of the adverse facts related to HealthSouth's declining rate of growth, delay in receipt of payments and pricing pressure from managed care companies.

60.    Moreover, with knowledge or recklessly disregarding that their scheme had artificially inflated the price of HealthSouth common stock, defendants issued and sold, or cause to be issued and sold, the following securities.

### HEALTHSOUTH

| Date | Securities Issued | Value | Purpose |
|---|---|---|---|
| 10/29/97 | Common Stock | $961 million | Horizon Healthcare Acquisition |
| 4/16/98 | Convertible Bonds | $567 million | Columbia Surgery Centers purchase |
| 7/22/98 | Common Stock | $590 million | National Surgery Centers purchase |

### CLAIM FOR RELIEF I

### For Violation of Section 10(b) Of The Exchange Act And Rule 10b-5 Against All Defendants

61.    Plaintiffs incorporate by reference ¶¶1-60.

62.    Each of the defendants:  (a) knew or had access to the material adverse non-public information about HealthSouth's

financial results and then-existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about HealthSouth.

63. During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64. Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of HealthSouth stock during the Class Period.

65. Plaintiffs and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for HealthSouth stock. Plaintiffs and the Class would not have purchased HealthSouth stock at the prices they paid, or at all, if they had been aware that the

36

market prices had been artificially and falsely inflated by defendants' false and misleading statements.

### CLAIM FOR RELIEF II

### For Violation of Section 20(a) Of The Exchange Act
### Against Defendants HealthSouth and Scrushy

66. Plaintiffs incorporate by reference ¶¶1-65.

67. Scrushy acted as a controlling person of healthSouth within the meaning of §20 of the Exchange Act. By reason of his positions as Chairman of the Board and CEO of HealthSouth, Scrushy had the power and authority to cause HealthSouth to engage in the wrongful conduct complained of herein. HealthSouth controlled each of the Individual Defendants and all of its employees.

68. By reason of such wrongful conduct, HealthSouth and Scrushy are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of HealthSouth stock during the Class Period.

### CLASS ACTION ALLEGATIONS

69. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 239a) and (b) on behalf of all persons who purchased the securities of Healthsouth during the class Period (the "Class"), except defendants, members of their immediate families and any entity in which a defendant has a controlling interest.

70.   The members of the Class are so numerous that joinder of all members is impracticable.  HealthSouth has more than 396 million shares of stock outstanding.  During the Class Period, thousands of persons purchased millions of shares of HealthSouth stock and were damaged thereby.

71.   Plaintiffs' claims are typical of the claims of the Class because plaintiffs and the Class members sustained damages from defendants' wrongful conduct.

72.   Plaintiffs will adequately protect the interests of the Class.  Plaintiffs have retained counsel who are experienced and competent in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

73.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

74.   Common questions of law and fact predominate over questions which affect only individual members.  Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by defendants' acts;

b.   whether HealthSouth's statements during the Class Period misrepresented and/or omitted material facts;

c.   whether defendants pursued the fraudulent scheme and course of business complained of;

d.   whether defendants acted intentionally or recklessly;

38

e.   whether the market price of HealthSouth securities was artificially inflated due to the activities complained of; and

f.   the extent and measure of damage sustained by the Class.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

75.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein in this complaint.   Further, none of the statements pleaded at ¶¶22-23, 26-28, 32-33, 35, 39-41, 46, 48, and 50-55 that were forward-looking statements were identified as "forward-looking statements" when made.   Nor was it stated that actual results "could differ materially from those projected."   Nor were the forward-looking statements made in ¶¶25, 34, 37, 45, and 47 accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.   Defendants are liable for the forward-looking statements in ¶¶25, 34, 37, 45, and 47 because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of HealthSouth who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

76.   Because the Private Securities Litigation Reform Act of 1995, §21D(c) of the Exchange Act [15 U.S.C. §78u4(c), requires complaints to be pleaded in conformance with Federal Rule of Civil Procedure 11, plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of HealthSouth's SEC filings, securities analysts' reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and pursuant to Rule 11(b)(3), believe that, after reasonable opportunity for discovery, substantial additional evidentiary support will likely exist for the allegations set forth in ¶¶22-55.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

1.   Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.   Awarding plaintiffs and the members of the Class compensatory damages;

3.   Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure and determining that plaintiffs' counsel is class counsel;

40

4.   Against each defendant and in favor of plaintiffs and all members of the Class for damages in an amount determined to have been sustained by plaintiffs and the members of the Class;

5.   Awarding plaintiffs and members of the Class the costs of this suit, including reasonable attorneys' and experts' fees and other disbursements;

6.   Against each defendant for damages jointly and/or severally;

7.   Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued thereunder, pursuant to Rules 64, 65 and any appropriate state law remedies, including attaching, impounding or imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets to assure that plaintiffs have an effective remedy; and

8.   Such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: _Nov. 16_ , 1998     LAW OFFICES OF M. CLAY RAGSDALE

By: _____

M. Clay Ragsdale
E. Ansel Strickland
1929 Third Avenue North
550 Farley Building
Birmingham, AL  35203
Tel: (205) 251-4775

41

BERGER & MONTAGUE, P.C.
Sherrie R. Savett
Jacob A. Goldberg
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000

WEINSTEIN KITCHENOFF SCARLATO
      & GOLDMAN
Paul J. Scarlato
1608 Walnut Street
Suite 1400
Philadelphia, PA  19103
Tel: (215) 545-7200

BRUCE G. MURPHY, ESQ.
265 Llwyd's
Vero Beach, FL  32963-3252
Tel: (561) 231-4202

207622.01

42

## PLAINTIFF'S SWORN CERTIFICATION

I, Vinod Parikh, certify that:

1.      I have reviewed the complaint and authorized its filing.

2.      I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      On August 26, 1998, I purchased 600 shares of Healthsouth Corporation common stock at a price of $23 1/8 per share.  On October 20, 1998, I purchased an additional 400 shares of Healthsouth at $11 ¼ per share.

5.      I have not sought to serve as a representative party on behalf of a class in a securities action during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Vinod Parikh   11/6/98